NEBEKER, Senior Judge:
Appellant Bobby Johnson appeals his jury convictions of assault with a dangerous weapon (“ADW”), aggravated assault while armed (“AAWA”), mayhem while armed (“MWA”), unlawful possession of a firearm (“UPF”), carrying a pistol without a license (“CPWL”), possession of an unregistered firearm (“UF”), unlawful possession of ammunition (“UA”), and three counts of possession of a firearm during a crime of violence (“PFCV”). Appellant presents two arguments on appeal. First, appellant contends that either the trial court failed to make a Batson finding that the government’s peremptory strikes were not the result of purposeful discrimination or the trial court’s Batson finding of no purposeful discrimination was clearly erroneous. Second, appellant contends that some of his convictions merge. We affirm appellant’s convictions, and remand for the trial court to merge the appropriate offenses and resentence appellant consistent with this opinion.
I.
The underlying charges stem from the following factual scenario. At the time of the shooting, the victim was scheduled to testify at trial against appellant’s brother, Jonathan “Bow Wow” Johnson. On his way to play basketball on July 15, 2009, the victim walked around a corner and saw appellant. “I just looked at him and then that’s when he must have saw me, and he was like, what’s up, homey, and then immediately he whipped out [a gun] and just started shooting.” “[T]he first ones I felt was in my butt. And then once I got shot in my right leg, I ain’t feel no more. I just felt me trying to drag myself behind — on the side of the building.”
The victim sustained several injuries. One bullet “lacerated the rectum, and it had gone in and there are several blood vessels in this area which were bleeding.” The victim still used a colostomy bag at trial. In addition, a bullet fractured the victim’s right knee and tibia, causing mo *1110 bility problems that persisted until at least the date of trial. The victim stated that his leg “was never going to be like God intended it to be” and that he would need to undergo further operations to save his leg.
During voir dire, the court asked several questions of each juror and both appellant and the government were offered an opportunity to ask follow up questions. Following voir dire, the government used peremptory strikes on jurors number 018 and 442, two African American males. The trial court had questioned these jurors during voir dire, but the government did not ask them additional questions. The trial court sua sponte pressed the government for a race-neutral explanation for the strikes:
THE COURT: Would counsel approach the bench.
(Bench conference.)
THE COURT: I want the government to explain these two strikes, juror 442 and juror 018.
MS. ACEVEDO: 442 is the older man, I thought he was very soft spoken and I thought that he would get pushed around in a jury.
THE COURT: That doesn’t pass muster.
MS. ACEVEDO: That he’s soft spoken? To me he seems like somebody who would not — who would not express himself and could get pushed around by other jurors.
THE COURT: What about the other one?
MR. TRUONG: Your Honor, that gentleman because — similar reason, given his youth, we have to believe that he’d not be an assertive member of the jury if he has an opinion or given the fact that he’s inexperienced in his youth, and we are concerned that he may not have the confidence to voice his views during deliberation.
THE COURT: Let me ask you a question: Did it occur, to either one of you to ask either of those jurors questions going to that? I mean, we had him up here. If that was a concern, could you have asked some kind of question about that?
MS. ACEVEDO: It is our experience, Your Honor, jurors don’t admit that they would be.
THE COURT: But you could see his reaction, sort of like cross-examination, people don’t confess but you ask them questions that would allow you to draw reasonable inferences.
MR. TRUONG: We thought the Court’s questioning of both jurors gave us enough — we thought that the Court’s questioning of both jurors give enough information to form an opinion whether we would like them to be on the jury. My impression of 018 was that he was kind of shy, and coupled with the fact that he — his age and my concern that he’s not forceful in expressing his views if there is a vigorous deliberation of the facts.
THE COURT: I guess that I could see that in the way he answered the questions. I don’t think I see any of that in the way the older man answered those questions. I don’t get that at all.
What did he say? Did you make any notes on him?
MS. ACEVEDO: Yes, Your Honor, my notes for him was that he was soft spoken. His tone of voice was very quiet. He didn’t seem like—
THE COURT: So you like screamers, you like yellers?
MS. ACEVEDO: Not screamers, Your Honor, but I believe jurors have to be very willing to express their opinions, and he didn’t — based upon his — in his gentle manner, he didn’t seem like somebody who would.
*1111 MR. TRUONG: The concern is not only expressing their opinion, but to defend it also.
THE COURT: All right. I want you to know that I’m going to have a keen eye going forward. We get panels that don’t necessarily have a lot of black males to start with, and if you start striking black males because they’re soft spoken, it raises my eyebrow. All right. Do you have anything on this?
MR. MCCANTS: Just, we want to make a challenge, and we felt as if the government has targeted black males. Striking the only two black males in the jury. Without articulating any unbiased reason.
THE COURT: Well, I think that they— I think that’s exactly what I asked them to do, and I believe they did articulate non-race based reasons. I guess it’s not my job to agree with them or disagree with them but to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated, so I’d have to say at this point that it does not raise to the level of a legitimate challenge, but my antenna is definitely up.
Let’s go forward.
(End of bench conference.)
After trial, the court sentenced appellant to an aggregate sentence of 386 months’ incarceration. The sentences for PFCV, AAWA, and UPF are consecutive as to each count, while the sentences for the remaining charges are concurrent as to each count and with AAWA. Appellant timely appealed.
II.
Appellant argues that the trial court did not properly conduct the Batson analysis. At oral argument, appellant contended that the trial court did not (as it should have) make a factual finding determining whether the strikes of the jurors were a result of purposeful discrimination. In his brief, appellant suggests that, if there was such a finding, it was clearly erroneous. We disagree -with both arguments.
A. The Batson Framework
Batson requires a three-part inquiry into whether the prosecutor engaged in purposeful discrimination while using a peremptory strike.
[0]nce the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.
Purkett v. Elem, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). Although the burden of producing evidence shifts during this inquiry, “the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike.” Id. at 768, 115 S.Ct. 1769.
B. The Trial Court’s Ruling
The trial court’s comments must be read in the context of this three-step process. The court’s initial reaction was to state that the government’s explanation for striking juror number 442 “doesn’t pass muster.” Appellant contends that this statement constitutes a factual finding of purposeful discrimination, but it is important to recognize that it was made at the outset of the inquiry, not at step three of the analysis. After this comment was made, the court and the prosecutors engaged in a long discussion, and the court ultimately concluded that the reasons given by the prosecutors did indeed “pass *1112 muster,” in the sense that they were “non-race based reasons.”
When defense counsel asserted that the prosecutors had not articulated “any unbiased reason” for striking the two jurors, the trial court responded:
I believe they did articulate non-race based reasons. I guess it’s not my job to agree with them or disagree with them but to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated, so I’d have to say at 'this point that it does not raise to the level of a legitimate challenge....
The judge’s analysis properly recognized that, at step two of the Batson inquiry, it was not his “job to agree ... or disagree with” the prosecutors’ strategy for exercising peremptory strikes. “Although the prosecutor must present a comprehensible reason, ‘[t]he second step of this process does not demand an explanation that is persuasive, or even plausible’; so long as the reason is not inherently discriminatory, it suffices.” Rice v. Collins, 546 U.S. 338, 338, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (quoting Purkett, supra, 514 U.S. at 767-68, 115 S.Ct. 1769). Although the trial judge quickly moved from step two to step three of the inquiry, he clearly held that the prosecutors had satisfied step two by “articulating] non-race based reasons.”
The court then focused on step three of the Batson procedure to determine whether appellant had carried his burden of proving that the prosecutors were engaged in purposeful racial discrimination when exercising their peremptory strikes. At this stage, “the trial court must evaluate not only whether the prosecutor’s demeanor belies a discriminatory intent, but also whether the juror’s demeanor can credibly be said to have exhibited the basis for the strike attributed to the juror by the prosecutor.” Snyder v. Louisiana, 552 U.S. 472, 477, 128 S.Ct. 1203, 170 L.Ed.2d 175 (2008). The court echoed these principles by commenting that its job was “to listen and see whether the reason is based on anything that the jurors said or any behavior that the juror demonstrated.... ” His ultimate assessment was: “I’d have to say at this point that it does not raise to the level of a legitimate challenge.... ” Considered in context, this conclusion is properly interpreted as a ruling on stage three of the Batson process.
C. Legal Analysis
Only the third step of the analysis is challenged on appeal. Because the prosecutors gave reasons for their strikes, the existence of a prima facie case is moot, see Epps v. United States, 683 A.2d 749, 752 (D.C.1996), and appellant concedes that “the government did articulate a race and gender-neutral reason for each strike.” This court’s case law does not specifically address whether being soft spoken or non-assertive are qualities that survive step two of a Batson challenge, but many courts have held that they do. E.g., People v. English, 119 A.D.3d 706, 988 N.Y.S.2d 697, 699 (2014) (soft spoken); State v. Carroll, 34 S.W.3d 317, 320 (Tenn.Crim.App.2000) (non-assertive); Magee v. State, 994 S.W.2d 878, 889 (Tex.Ct.App.1999) (soft spoken). We hold today that being soft spoken or non-assertive are both race-neutral explanations for a peremptory strike.
For the reasons already stated, we reject appellant’s argument that the trial court failed to make a ruling on the issue of purposeful discrimination. We now turn to appellant’s attack upon the finding that was made.
“[A] trial court’s ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous.” *1113 Smith v. United States, 966 A.2d 367, 377 (D.C.2009) (quoting Snyder, supra, 552 U.S. at 477, 128 S.Ct. 1203). “[The Supreme Court has] recognized that these determinations of credibility and demeanor lie ‘peculiarly within a trial judge’s province’ .... ” Miller-El v. Cockrell, 537 U.S. 322, 339, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003) [hereinafter “Miller-El I ”] (quoting Hernandez v. New York, 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) (plurality)). This evaluation of the third part of Batson is made “in light of all evidence with a bearing on it.” Miller-El v. Dretke, 545 U.S. 231, 252, 125 S.Ct. 2317, 162 L.Ed.2d 196 (2005) [hereinafter “Miller-El II ”]. The trial court, however, is not required to make detailed findings of fact or to give a detailed explanation following a Batson challenge. Miller-El I, supra, 537 U.S. at 347, 123 S.Ct. 1029; Smith, supra, 966 A.2d at 375; see Hernandez, supra, 500 U.S. at 369-70, 372, 111 S.Ct. 1859.
The trial court observed the prosecutor and the jurors, and used these observations to make the finding quoted above. Given that the trial court is not required to make detailed factual findings, we hold that the trial court’s explanation is sufficient to satisfy the third part of Batson.
Appellant contends that the trial court clearly erred in finding the race-neutral explanations credible because the prosecution did not ask the two African American male jurors questions during voir dire. This court rejected a very similar objection in Jefferson v. United States, 631 A.2d 13, 16 (D.C.1993) (rejecting an objection when the prosecution “excluded a black male who had not answered a single question during voir dire ”). Since the trial court asked questions of these two jurors, could observe their responses first hand, and sua sponte pressed the prosecutors for more detailed explanations about why they wanted to strike these two jurors, the trial court was in the best position to make these critical credibility determinations.[1]
Considering all of the circumstances presented, we are not persuaded that the trial court’s finding of no purposeful discrimination was clearly erroneous.
III.
Appellant argues that his convictions merge since they were companion offenses stemming from the same transaction. Both appellant and the government agree that some offenses merge, but they disagree about whether AAWA and PFCV merge. In addition, the parties do not agree on whether this court should just vacate the merged offenses on appeal, or remand with instructions to merge the appropriate offenses and to resentence appellant.
First, appellant contends that ADW, MWA, and PFCV should merge with the AAWA, leaving a single offense. The government contends that merger is appropriate but that appellant would be left with two offenses, AAWA and PFCV. Both parties and our case law are in agreement that ADW, MWA, and AAWA merge. Nero v. United States, 73 A.3d 153, 160 (D.C.2013). As such, this court’s analysis will focus on whether the PFCV merges with AAWA. These two offenses do not merge.
*1114 The Fifth Amendment Double Jeopardy Clause prohibits “multiple punishments for the same offense.” Whalen v. United States, 445 U.S. 684, 688, 100 S.Ct. 1482, 63 L.Ed.2d 715 (1980) (internal quotation omitted). When considering whether two offenses stemming from the same act merge, we evaluate whether each offense “requires proof of a fact which the other does not.” Blockburger v. United States, 284 U.S. 299, 304, 52 S.Ct. 180, 76 L.Ed. 306 (1932). It is well established in this court’s precedent that the “Council of the District of Columbia did not intend for the offense defined by 3204(b) [PFCV] to merge with an offense subject to the enhanced penalty provision of 3202 [now located at D.C.Code § 22-4502 (2012 Repl.) ] for committing an underlying offense while armed.” Hanna v. United States, 666 A.2d 845, 856 (D.C.1995) (internal quotation omitted). In this case, the underlying offense while armed is AAWA — aggravated assault subject to the enhanced penalty provision of D.C.Code § 22-4502. As such, we find that the PFCV does not merge with the underlying offense, ' AAWA.
The government asks this court to vacate certain merged crimes without remanding, or in the alternative, to remand to the trial court to resentence appellant. As cited by the government, this court in Thome remanded for resentencing when it vacated one of defendant’s two concurrent burglary sentences, thus “permit[ting] the trial court to effectuate its original sen-fencing plan.” Thorne v. United States, 471 A.2d 247, 249 (D.C.1983). We agree that a remand is appropriate here.[2]
IV.
This court affirms appellant’s convictions, and remands for the trial court to merge the appropriate offenses and resen-tence appellant consistent with this opinion.

So ordered.

. Appellant does not contend that this case was racially charged, so that the attorneys might have a motive to focus on the race of the jurors. In addition, the overall pattern of peremptory challenges and the composition of the resulting jury do not raise any red flags. The government used peremptory strikes on two black males, one white male, four black females, and three white females. Appellant used peremptory strikes on no black males, two white males, one Asian male, two black females, three white females, and one Indian female. The final jury included twelve females and two males, but data revealing racial composition is not available.

. Appellant’s argument that the MWA conviction was not supported by sufficient evidence is moot because, on remand, appellant's MWA conviction will merge with appellant’s AAWA conviction.